NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-330                                          Appeals Court

PRESTON THOMPSON & others[1]  vs.  CIVIL SERVICE COMMISSION &
another[2] (and a companion case[3]).

No. 15-P-330.

Suffolk.     May 10, 2016. - October 7, 2016.

Present:  Cypher, Blake, & Henry, JJ.

Civil Service, Police, Termination of employment, Testing,
     Reinstatement of personnel, Decision of Civil Service
     Commission.  Labor, Police, Collective bargaining,
     Discharge.  Municipal Corporations, Police, Collective
     bargaining.  Police, Discharge, Collective bargaining.
     Public Employment, Police, Collective bargaining,
     Termination, Reinstatement of personnel.  Administrative
     Law, Substantial evidence.  Damages, Back pay.

Civil actions commenced in the Superior Court Department on
April 3, 2013.

---

[1] Richard Beckers, Ronnie Jones, Jacqueline McGowan, Oscar
Bridgeman, Shawn Harris, Walter Washington, William Bridgeforth,
George Downing, and Rudy Guity.

[2] Boston Police Department.

[3] Boston Police Department vs. Ronnie C. Jones, Richard
Beckers, Shawn Harris, Jacqueline McGowan, Walter Washington,
George Downing, and the Civil Service Commission.  The two cases
were consolidated below for decision.

After consolidation, the case was heard by Judith Fabricant, J., on motions for judgment on the pleadings.

Alan H. Shapiro (John M. Becker with him) for Preston Thompson & others.

Helen G. Litsas for Boston Police Department.

Amy Spector, Assistant Attorney General, for Civil Service Commission.

BLAKE, J.  Between 2001 and 2006, ten officers of the Boston police department (department) submitted hair samples to the department that tested positive for cocaine.  In response, the department terminated their employment.  The ten officers appealed the terminations to the Civil Service Commission (commission).  After extensive hearings, the commission issued a decision upholding the terminations of Preston Thompson, Rudy Guity, Oscar Bridgeman, and William Bridgeforth (hereinafter, four officers), and overturning the terminations of Richard Beckers, Ronnie Jones, Jacqueline McGowan, Shawn Harris, Walter Washington, and George Downing (hereinafter, six reinstated officers or six officers), who were ordered to be reinstated with back pay and benefits to the date the commission hearings commenced.

The department and each of the ten officers filed a complaint for judicial review.[4]  A judge of the Superior Court

---

[4] The six reinstated officers sought judicial review only with regard to the back pay and benefits aspects of the commission decision.

affirmed the commission's decision, modifying only the back pay and benefits awards for the six reinstated officers to the date of each of their respective terminations.  The four officers appeal, claiming that the department lacked just cause for their terminations.  The department cross-appeals, claiming that there was substantial evidence to warrant the termination of the six reinstated officers.[5]  We affirm.

Background.  1.  Legal framework.  A tenured civil service employee who is aggrieved by a disciplinary decision of an appointing authority may appeal to the commission.  See G. L. c. 31, § 41.  After finding facts anew, the commission then must determine, by a preponderance of the evidence, whether the appointing authority met its burden of proof that there was just cause for the action taken.  See Massachusetts Assn. of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 260 (2001); Falmouth v. Civil Serv. Commn., 447 Mass. 814, 823-824 (2006).  We, in turn, need only inquire whether the commission's decision was "legally tenable," accepting the commission's factual determinations unless they are unsupported by "substantial evidence on the record as a whole."  Commissioner of Health & Hosps. of Boston v. Civil Serv. Commn., 23 Mass. App. Ct. 410,

---

[5] The commission and the six reinstated officers did not appeal the judgment of the Superior Court.

411 (1987).  See Andrews v. Civil Serv. Commn., 446 Mass. 611, 615-616 (2006).

2.  Commission decision.  The commission conducted hearings over eighteen days between October, 2010, and February, 2011, at which it received 202 exhibits and heard oral testimony from expert witnesses, each of the officers, and additional fact witnesses called by both sides.  On February 28, 2013, the commission issued a comprehensive 132-page decision.  We summarize the relevant portions of that decision as follows, reserving other facts for later discussion.

The ten officers are members of the Boston Police Patrolmen's Association (union).  Rule 111, incorporated in the collective bargaining agreement (CBA) between the union and the department, provides for annual hair testing for drugs as part of the department's substance abuse policy.[6],[7]  Under rule 111,

_____

[6] A prior version of rule 111 provided for random urinalysis; this version was abandoned following the issuance of Guiney v. Police Commr. of Boston, 411 Mass. 328, 329 (1991).

[7] Rule 111 provides, in relevant part:

"V.  TESTING

"Sworn personnel of the Boston Police Department will be tested for drugs and/or alcohol under the following circumstances:  . . .

"G. Annual Drug Testing (Hair) . . . .  [T]he parties agree that all sworn personnel shall be subject to an annual drug test to be conducted through a fair, reasonable, and objective hair analysis testing system.

an employee "will be subject to termination" for a positive test result unless it is the officer's first violation.  In that circumstance, the department shall offer the officer voluntary submission to a rehabilitation program.  See note 7, supra.  The notices of termination of each of the ten officers cited a violation of rule 111.[8]

Prior to its implementation, the hair testing program was the subject of extensive meetings and research within the union

---

Each Officer shall submit to an annual test on or within thirty (30) calendar days of each Officer's birthday. . . .

"The Department agrees that it will establish and adhere to written collection and testing procedures for hair samples.  These procedures shall be fair and reasonable so as to ensure the accuracy and integrity of the test and process. . . .

"VI.  CONSEQUENCES OF A POSITIVE TEST

"ILLICIT DRUGS
"Sworn personnel who receive a verified positive test result for illicit drugs will be subject to termination. However, where the Officer's only violation is a positive test for illicit drug use and it is the Officer's first offense, the Commissioner shall offer voluntary submission to the following alternative [rehabilitation] program: . . . .

"VII.  CONSEQUENCES OF VIOLATION OF THE POLICY

"Any violation of the Substance Abuse Policy shall lead to disciplinary action up to and including termination.  The severity of the action chosen will depend on the circumstances of each case."

[8] The notices also cited violations of rules related to the conduct of department personnel and conformance to laws, based on the same positive hair test result.

and the department.  As part of that process, both the department and the union met with the legal counsel and a scientist from Psychemedics, Inc. (Psychemedics), the company eventually chosen to perform the testing, which provided assurances that its testing was "state of the art" and could, with respect to any particular drug, distinguish between voluntary ingestion and environmental exposure.  The two sides also agreed on a number of essential elements of the program, including the appropriate "cutoff level," representing the minimum amount of a drug in a person's system required to trigger a positive test result for ingestion, and the availability of a second "safety net" retest.

A threshold issue before the commission was the scientific reliability of the hair testing, and its ability to distinguish between voluntary ingestion and environmental exposure.  The ten officers and the department held competing views as to whether the testing alone was reliable enough to establish just cause supporting the officers' terminations.  In support of their position, the ten officers called two expert witnesses, while the department opposed with its own panel of experts, including Dr. Thomas Cairns, a long-time employee and scientist at

Psychemedics.[9]  Ultimately, the commission found that the hair

testing methodology was not sufficiently reliable to be the sole

basis for an officer's termination, concluding that "[a]

reported positive test result . . . is not necessarily

conclusive of ingestion and, depending on the preponderance of

evidence in a particular case, may or may not justify

termination or other appropriate discipline of a tenured

[department] officer."  Nonetheless, the commission found that

hair testing is an appropriate tool to enforce the department's

substance abuse policy and that hair test results could be used

as some evidence of drug use.[10,11]

Turning to whether just cause had been established in the

present case as to the ten officers, as noted, the commission

allowed them a full opportunity to present evidence refuting

their positive test results.  Taking that evidence, in addition

to the positive test results, the commission considered each

individual officer's credibility based on his or her testimony

---

[9] Cairns had worked for Psychemedics since 1995.  At the
time of the commission hearings, he was its vice-president for
research and development.

[10] The commission also found that the testing was conducted
with "reasonable scientific accuracy" and "an impressive variety
of quality control procedures," and that hair testing allows for
a greater window of detection beyond urine and blood testing,
which is limited to the hours or days following ingestion.

[11] In a concurring decision, three commissioners opined that
a positive hair test was sufficiently reliable to create a
rebuttable presumption that the officers ingested cocaine.

before the commission, any officer's refusal to acknowledge drug use by refusing the rehabilitation program, any absence of prior positive drug test results, and any officer's decision to obtain independent hair or other drug tests.  Based on its review of this evidence, the commission found that the additional evidence presented by the six officers outweighed the positive test results and ordered them reinstated with back pay from the date the hearing commenced, October 21, 2010.  The commission took the converse view as to the remaining four officers and upheld their terminations.

3.  Superior Court decision.  On April 3, 2013, the ten officers and the department each filed separate complaints in the Superior Court seeking judicial review of the commission's decision.[12]  See G. L. c. 30A, § 14.  The department sought relief on the basis that (1) the commission had incorrectly found that positive hair tests alone were insufficient to support a termination, (2) the commission had ignored the language of the CBA in reaching its conclusion, and (3) the commission's decision as to the six officers was unsupported by substantial evidence.  The four officers challenged the commission's authority to act on any ground other than the unreliable hair test results, and also claimed that the decision

---

[12] The cases were later consolidated for decision in the Superior Court.  See note 3, supra.

was not supported by substantial evidence. The six officers argued that they were entitled to back pay and benefits commencing from the date of their individual terminations.

In a detailed and thoughtful decision, the judge affirmed the commission's decision, with the exception of the back pay and benefits awards. On that point, the judge agreed with the six officers and ordered modification of the remedy accordingly. The department and the four officers now appeal to this court, restating the arguments they presented in the Superior Court. The department additionally challenges the judge's modification of the back pay and benefits awards.

Discussion. 1. Implication of a positive test. Both the department and the four officers maintain that the commission erred in the weight it afforded the positive hair test results. The department, on the one hand, argues that under the preponderance of the evidence standard, a positive test result alone is enough to terminate an officer's employment. The four officers, on the other, claim that because the notices of termination specified only a positive hair test, once the commission found that the hair testing by Psychemedics was not sufficiently reliable to be the sole basis for termination, the hearings should have concluded and the ten officers should have been reinstated. Both arguments demonstrate a misunderstanding of the scope of the commission's review under G. L. c. 31, § 43.

As we stated supra, when a case comes before the commission, it hears evidence and finds facts anew. In undertaking this process, the commission is not limited to the evidence that was before the appointing officer, but may consider any and all evidence before the commission that it considers relevant. See Sullivan v. Municipal Ct. of the Roxbury Dist., 322 Mass. 566, 572 (1948) (interpreting earlier version of § 43). See also Leominster v. Stratton, 58 Mass. App. Ct. 726, 727-728 (2003) (question is whether, on facts found by commission, "there was reasonable justification for the action taken by the appointing authority in the circumstances found by the commission to have existed when the appointing authority made its decision" [citation omitted]).

Here, after an exhaustive inquiry on the scientific reliability of the Psychemedics hair testing methodology, the commission reached the conclusion that a positive test was not conclusive on the question of voluntary ingestion, as the positive test may also represent sample contamination by environmental exposure. In other words, the commission found that the risk of a false positive test was great enough to require additional evidence to terminate an officer for just cause.[13] That conclusion is well supported by the record, which

---

[13] In its decision, the commission states: "given the uncertainty about the efficacy of current decontamination

includes evidence of shifting cutoff levels through the years since the testing had been implemented, a lack of general acceptance in the scientific and law enforcement communities,[14] and a lack of universally recognized industry standards.  Having reached that conclusion, the commission logically proceeded to examine and to weigh the other evidence available either supporting or refuting ingestion on the part of each officer, applying the preponderance of the evidence standard, and to make a decision as to each officer accordingly.  In doing so, the commission patently did not, as the department claims, assign to it an "elevated burden of proof."

As to the written notices of termination, the rationale provided is not as narrow as the four officers suggest.  "[A] decision of the commission is not justified if it is not based on the reasons specified in the charges brought by the

_____

strategies and metabolite criteria to rule out all real-world contamination scenarios, hair test results cannot be used in rote fashion as a conclusive and irrefutable means to terminate a [department] officer on the premise that such testing is 'generally accepted' as reliable."

[14] For example, the commission noted that "[d]espite more than a decade of study and a clear federal policy against drugs in the workplace, the [Substance Abuse and Mental Health Services Administration, the Federal agency charged with improving quality and availability of prevention, treatment, and rehabilitative services with respect to substance abuse and mental illness] has declined to approve hair testing as a modality for detection of illicit drugs by employees of the federal government and those employed in the private sector that are subject to federal oversight."

appointing authority."  Murray v. Second Dist. Ct. of E. Middlesex, 389 Mass. 508, 516 (1983).  Here, a reasonable officer would have understood that the reason he or she was facing termination was for violating department rules and regulations related to substance abuse, with the positive hair test result as evidence supporting the violation.  See McKenna v. White, 287 Mass. 495, 498 (1934) (notice meant to "enable the removed officer or employee to know why he has been deemed unworthy to continue longer in the public service").  The commission accordingly properly examined all of the evidence related to whether there was a violation of rule 111, not simply the positive hair test result.

2.  Language of the CBA.  The department argues that the commission "usurped the [d]epartment's independent judgment and bargaining autonomy" by ignoring the controlling language of rule 111, incorporated in the CBA, which provides that an officer may be terminated based solely on a positive hair test. The commission decision, however, reveals a direct conflict between the CBA and the civil service law:  namely, that while G. L. c. 31, §§ 41 and 43, permit termination only for just cause, see Massachusetts Assn. of Minority Law Enforcement Officers v. Abban, 434 Mass. at 260, the CBA allows the appointing authority to terminate even when the test result may not reflect actual misconduct.  In those circumstances, the

commission ruled that, despite the provisions of the CBA, more evidence than a positive hair test was needed to demonstrate just cause.  We agree that the statute controls.

"When possible, we attempt to read the civil service law and the collective bargaining law, as well as the agreements that flow from the collective bargaining law, as a 'harmonious whole.'"  Fall River v. AFSCME Council 93, Local 3177, AFL-CIO, 61 Mass. App. Ct. 404, 406 (2004), quoting from Dedham v. Labor Relations Commn., 365 Mass. 392, 402 (1974).  Where there is a conflict, however, as here, the civil service law controls as it "is not one of the statutes enumerated in G. L. c. 150E, § 7(d), and, therefore, may not be superseded by a collective bargaining agreement."  Fall River v. Teamsters Union, Local 526, 27 Mass. App. Ct. 649, 651 (1989).  See Dedham v. Dedham Police Assn. (Lieutenants & Sergeants), 46 Mass. App. Ct. 418, 420 (1999).

3.  Substantial evidence.  Both the department and the four officers challenge the evidence supporting the commission decision.  To withstand review, the decision must be supported by substantial evidence.  See G. L. c. 30A, § 14(7). Substantial evidence is defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Boston Gas Co. v. Assessors of Boston, 458 Mass. 715, 721 (2011), quoting from Tennessee Gas Pipeline Co. v. Assessors of Agawam, 428 Mass. 261, 262 (1998).  See G. L.

c. 30A, § 1(6).  In our review of the administrative record, we defer entirely to the commission on issues of credibility and the weight to be accorded to the evidence.  See Hickey v. Commissioner of Pub. Welfare, 38 Mass. App. Ct. 259, 262 (1995). The standard was met here.

With great precision, the commission carefully analyzed each officer's individual case in reaching the determination that the department had met its burden as to the four officers, but not as to the six reinstated officers.  In doing so, a divergent pattern of evidence emerged in the decision as to three factors:  the level of cocaine present in the positive test, independent hair test results, and credibility.  As to the four officers, each of their initial tests and each of their safety net retests were positive at levels well above the cutoff level.[15]  Two of the four officers had no independent hair testing following the initial positive test, while a third prevaricated in his testimony on the issue, finally admitting that his independent hair test was positive.  Lastly, as to each of the four officers, the commission found the testimony in

---

[15] For instance, Thompson's initial test showed a level of cocaine three times the cutoff level; Bridgeforth's initial test was two times the cutoff level.

support of their denials to lack credibility.[16]  In contrast, each of the six officers had initial cocaine levels that were barely above the cutoff limit[17] and each presented evidence of negative independent hair tests.  As to credibility, the commission found that the six officers each presented a credible denial of drug use based on their testimony and any additional supporting evidence.[18]  In sum, the evidence amply supported the commission decision.

4.  <u>Back pay and benefits awards</u>.  General Laws c. 31, § 43, as appearing in St. 1981, c. 767, § 20, provides that, if the commission reverses the action of the appointing authority, "the person concerned shall be returned to his position without loss of compensation or other rights."  Here, the commission ordered the reinstatement of the six officers retroactive to October 21, 2010, the date the parties appeared ready to commence the evidentiary hearings before the commission.  In so doing, the commission found that there were unique circumstances

---

[16] For the officer whose positive independent hair test "slipped his mind," the commission described his testimony on that issue as "a mortal wound on his credibility."

[17] As to five of those officers, under prior cutoff levels, their initial test results would have been negative.

[18] Contrary to the department's suggestion, no additional expert testimony was needed to disprove that ingestion was the cause of the officers' positive initial tests.  That argument ignores the fact that the expert evidence presented showed that the test, itself, was unreliable, thus requiring further inquiry.

warranting deviation from § 43, including unusual delay, the lack of a claim by the officers of political or improper motive, and the failure of some officers to attempt to find new employment.

In modifying the order, the judge correctly explained that where the legislative directive is clear and unequivocal, as it is in § 43, no exceptions, however worthy, may be applied. See Garrison v. Merced, 33 Mass. App. Ct. 116, 118 (1992) ("The distinction between words of command and words of discretion, such as 'shall' and 'may' have been carefully observed in our statutes"). Therefore, once the commission reversed the decision of the appointing authority as to the six officers, under the "shall" language of § 43, the commission was required to return each of them to his or her position without loss of compensation or other rights. Accordingly, the six officers are entitled to reinstatement with back pay and benefits retroactive to each officer's termination date.

Judgment affirmed.